**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **NORMAN HECHING et al.,** )<br>)<br>    **Plaintiffs,** )<br>)<br>**v.** )<br>)<br>**SYRIAN ARAB REPUBLIC,** )<br>)<br>    **Defendant.** )<br>)<br>**NORMAN HECHING et al.,** )<br>)<br>    **Plaintiffs,** )<br>)<br>**v.** )<br>)<br>**ISLAMIC REPUBLIC OF IRAN,** )<br>)<br>    **Defendant.** ) | **Case No.  17-cv-1192 (TSC)**<br><br><br><br><br>**Case No. 17-cv-1659 (TSC)** |

<u>**REPORT AND RECOMMENDATION OF THE SPECIAL MASTER RE:
FSIA CLAIMS OF THE ESTATE OF RABBI MOSHEH TWERSKY,
BASHY MIRIAM TWERSKY, MESHULAM TWERSKY, REFAEL TWERSKY,
NECHAMA CHARLAP, RIVKA WALDER AND AVRAHAM TWERSKY**</u>

The Estate of Rabbi Mosheh Twersky, Bashy Miriam Twersky, Meshulam Twersky, Refael Twersky, Nechama Charlap, Rivka Walder, and Avraham Twersky (the "Twersky Plaintiffs") seek individual compensatory damages pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A, for injuries sustained directly or vicariously as a result of a terrorist attack in Har Nof, Jerusalem on November 18, 2014 ("November 18 Attack")—an attack resulting in the death of Rabbi Mosheh Twersky.  In accordance with this Court's Order dated June 8, 2023, Federal Rule of Civil Procedure 53, and the Federal Rules of

Evidence, the Special Master has received and reviewed testimonial and documentary evidence to assist in formulating and recommending those damages to which the Twersky Plaintiffs may be entitled.

## BACKGROUND

On November 18, 2014, two terrorists armed with a meat cleaver and a gun entered the Bnei Torah  Synagogue in the Har Nof neighborhood of Jerusalem, murdering Rabbi Kalman Levine, Rabbi Aryeh Kupinsky, and Rabbi Mosheh Twersky and injuring Dr. Norman Heching, Joseph Werfel, David Samuel Salis, Avraham Nefoussi, Akiva Pollack, Rabbi Saul Goldstein, and his twelve-year-old son, Mordechai Goldstein.

## PROCEDURAL HISTORY

Plaintiffs filed the underlying complaint against the Syrian Arab Republic ("Syria"), 17-cv-1192 (TSC) ("1192") on June 18, 2017 (1192-ECF No. 1) and an amended version on July 25, 2017 (1192-ECF No. 6).  On August 15, 2017, plaintiffs filed an identical complaint against the Islamic Republic of Iran ("Iran"), 17-cv-1659 (TSC) ("1659") (1659-ECF No. 1), designating the two actions as related (1659-ECF No. 3).  The complaints pray for compensatory damages for the brutal November 18, 2014 terrorist attack—an act facilitated by defendants Iran and Syria and perpetrated by their terrorist organization proxy, the Popular Front for the Liberation of Palestine ("PFLP").  Plaintiffs seek redress under 28 U.S.C. § 1605A(c), District of Columbia or Israeli law, for wrongful death, survival damages, battery, assault, intentional and negligent infliction of emotional distress, negligence, civil conspiracy, aiding and abetting, and vicarious liability/respondeat superior.

Plaintiffs served Syria via diplomatic channels, pursuant to 28 U.S.C. § 1608(a)(4), on January 16, 2018, 1192-ECF No. 15, and Iran, on February 7, 2018, 1659-ECF No. 12.  Neither

defendant filed a timely response, prompting plaintiffs to move for an entry of default against each, which the Clerk of Court entered against Syria on May 14, 2018, 1192-ECF No. 17, and against Iran on April 13, 2018, 1659-ECF No. 14.

On January 18, 2022, plaintiffs moved for default judgment as to liability against both Syria and Iran, 1192-ECF No. 21 & 1659-ECF No. 22.  On March 5, 2023, this Court issued a Memorandum & Opinion, finding that Syria and Iran, "acting through the PFLP, engaged in extrajudicial killing and provided material support and resources for such acts within the meaning of § 1605A(a)(1)," and holding both sovereigns "liable under § 1605A(c) for any personal injuries the extrajudicial killings or their material support caused."  1192-ECF No. 26 at 11–12 & 1659-ECF No. 27 at 11–12.  The Court reserved final judgment pending its review of the submissions of the special master, which it appointed on June 8, 2023, "to take evidence and file a report and recommendation regarding the measure of individual compensatory damages for which the defendants, the Syrian Arab Republic ('Syria') and the Islamic Republic of Iran ('Iran'), are liable to the Plaintiffs herein."  1192-ECF No. 28 & 1659-ECF No. 30.

This Report and Recommendation focuses on the individual compensatory claims brought by the Twersky Plaintiffs against Syria and Iran for their complicity in the November 18 Attack.

### THE TWERSKY PLAINTIFFS

### The Estate of Rabbi Mosheh Twersky

Rabbi Mosheh Twersky's estate supports its compensatory claim for damages through testimonial evidence captured in the declaration of Yosef Posternac, dated February 20, 2024 ("YP-Decl."), the declaration of Avraham Nefoussi, dated January 5, 2022 ("AN-Decl."), and the declaration of Rabbi Moshe Meiselman dated February 8, 2024.  Rabbi Twersky's prayer for

pecuniary damages is supported by a forensic economic report prepared by Michael Soudry, MBA, of Eco-Stat, LLC, dated February 20, 2024 ("MT-Econ.-Rep.").

### Yosef Posternac—Testimony

On the morning of November 18, 2014, Yosef Posternac was "present in the prayer hall of Congregation Bnei Torah, Har Nof, Jerusalem" when, at "approximately 7:00 a.m.," he "heard the sound of two gunshots from just outside the doors of the sanctuary." YP-Decl. ¶¶ 2–3.

Upon seeing "the first terrorist enter with a gun in his hand," Yosef took cover under a table—a vantage point that allowed him to witness "what was happening in the rest of the room." *Id*. ¶ 4. From there, he watched as a "second terrorist entered holding a large butcher's knife" while other congregants, realizing they were in the midst of a terrorist attack, began "shouting in fear and trying to flee." *Id*. ¶¶ 5–6. Yosef recalls one terrorist shooting and killing Rabbi Abraham Shmuel Goldberg "at point-blank range" and then firing upon Rabbi Twersky, who lay on the ground "writhing in his own blood," while "the second terrorist pounced on him with the butcher's knife and made sure [he] was dead." *Id*. ¶¶ 7, 9.

### Avraham Nefoussi—Testimony

Avraham Nefoussi, a voluntary Emergency Medical Technician ("EMT") affiliated with United Hatzalah, grew up in the Har Nof section of Jerusalem, where he resided until 2015. AN-Decl. ¶¶ 1–2.

On the morning of the November 18 Attack, Avraham was leaving for work when he received a dispatch from United Hatzalah that a "shooting incident" was underway at the Bnei Torah Synagogue, located "right around the corner" from Avraham's apartment. *Id*. ¶ 4. Avraham drove to the scene, assuming the incident was little more than "a security guard accidentally discharging his weapon." *Id*. ¶¶ 4–5.

Two minutes after receiving the emergency dispatch, Avraham arrived at the main entrance of the synagogue, where he observed "policemen on the sidewalk with their guns trained on two terrorists who were on the ground" and a "bloody meat cleaver" beside one of them. *Id.* ¶¶ 7, 12. Responding to a policeman calling for EMTs, Avraham ran up the stairs into the synagogue, passing the body of Rabbi Levine. *Id.* Upon seeing a man slumped against a wall, bleeding, Avraham went to retrieve a stretcher to carry him to an ambulance. *Id.* ¶ 13. After transporting a second victim to safety, Avraham returned to the building, where he encountered "the body of Rabbi Twersky," whose one hand had been almost entirely "severed" with "most of the fingers cut off." *Id.* ¶ 15.

### Rabbi Moshe Meiselman—Testimony

Rabbi Moshe Meiselman is the Dean of Yeshiva Toras Moshe ("YTM"), a "post-high school for advanced Jewish religious studies" that he founded in 1982. MM-Decl. ¶ 1. Rabbi Meiselman confirmed that Rabbi Twersky was a "salaried full-time teacher at YTM from 2003 until the time of his murder in November 2014." *Id.* ¶ 2–3. Based on his experience that "teachers at YTM (and at other yeshivas) . . . continue teaching until the end of their lives," coupled with his "close personal relationship with Rabbi Twersky," Rabbi Meiselman has "no doubt whatsoever that [Rabbi Twersky], too, would have continued to teach until the natural end of his life." *Id.* ¶ 6. Rabbi Meiselman explains that, had Rabbi Twersky not been murdered in the November 18 Attack, his salary "would have increased from time to time in future years," allowing him to realize "a 20% increase after 15 years, with an additional 5% every five subsequent years." *Id.* ¶¶ 3, 5. Rabbi Meiselman believes any calculation of Rabbi Twersky's economic losses that assumes he would have retired at an "average retirement age" would be a "mistake." *Id.* ¶ 7.

**Economic Damages**

In addition to Rabbi Meiselman's testimony, Rabbi Twersky's estate supports its prayer for financial damages with a forensic economic report captioned, "Analysis of the Economic Loss to the Family of Mosheh Twersky" ("MT-Econ.-Rep."), prepared by Michael Soudry, MBA. Mr. Soudry estimated Rabbi Twersky's losses after reviewing (1) Answers to Eco-Stat's Wrongful Death Questionnaire, (2) the Complaint and First Amended Complaint, (3) Rabbi Twersky's earnings records for the years 2008 through 2014, (4) Bashy Twersky's earning record for 2014, and (5) the declaration of Rabbi Moshe Meiselman. MT-Econ.-Rep. at 2.

From these sources, Mr. Soudry ascertained that Rabbi Twersky (1) was 59.2 years old when he was murdered, (2) was living in Israel at the time of his death, (3) was employed as a yeshiva schoolteacher, and (4) is survived by his wife, Bashy, and their five children. *Id*. at 3.

Mr. Soudry overlaid this information onto statistical data generated by the Israel Central Bureau of Statistics; the Government of Israel Minister of Finance, Income Tax Brackets, Social Security and Health Insurance; the Journal of Legal Economics; and the Israel Social Security Administration. Applying indicators from these sources, Mr. Soudry projected that Rabbi Twersky (1) had a life expectancy of 83.4 years, (2) would have worked either until age 67.0 (the age in which his Israeli Social Security retirement benefits would fully vest) or age 75 (the "assumed retirement age" for yeshiva school teachers in Israel, as suggested by Rabbi Meiselman), *id*. at 2 n. 1, and (3) would have realized future annual earnings of $14,262 per year based on his income stream in 2011, 2012, and 2013. *Id*. at 3–5.

To these figures, Mr. Soudry applied an average annual growth rate of 2.9%, adjusted earnings to reflect a statistical unemployment rate of 5.1% per year, deducted Israeli taxes at an effective annual rate of 31.5%, and factored in personal consumption at 40%. *Id*. at 4–5.

Finally, Mr. Soudry discounted these future values to present value by 3.4%, reflecting the average yield on 10-year long-term government bonds. *Id.* at 5. Applying these calculations, Mr. Soudry estimated the present value of Rabbi Twersky's cumulative economic loss to be $55,724, assuming a retirement age of 67, or $121,583, assuming a retirement age of 75. *Id.* at 6–7.

### Bashy Miriam Twersky—Rabbi Mosheh Twersky's Spouse

Bashy Twersky supported her prayer for compensatory relief through testimonial evidence captured in a declaration dated January 3, 2023 ("BT-Decl.").

### Bashy Twersky—Testimony

Bashy Twersky, Rabbi Twersky's spouse, was born in Brooklyn, New York, in 1957 and, at all relevant times, has been a U.S. citizen. BT-Decl. ¶ 1.

Rabbi Mosheh Twersky and Bashy Twersky married in 1980 and took up residence in New York, where Mosheh continued his Judaic studies. *Id.* ¶ 5. Bashy testified that her husband was born in 1955, raised in Boston, Massachusetts, and has always been a U.S. citizen. *Id.* ¶ 3. According to Bashy, Rabbi Twersky, "[f]rom an early age," was "widely recognized" as an "extraordinary scholar of both Judaic and secular studies," having excelled as a student at Harvard University, where his father had founded the Center for Jewish Studies. *Id.* ¶ 4. In 1984, the couple moved to Israel, "where Mosheh taught at a yeshiva," and Bashy launched her career as an "educator." *Id.* ¶ 5. Bashy recalls Mosheh having a "huge impact" on her "self-confidence as a professional" by encouraging her to accept promotions, which culminated in her position as an "assistant principal at a girls' high school." *Id.* ¶ 6.

Bashy characterizes Mosheh as the "center" of their family's life, describing him as "the essence of the home, the happiness of the home, [and] the soul of [their] home." *Id.* ¶ 7. She

recalls her husband leading the weekly Sabbath meals, which were the family's time for "special foods, songs, laughter, and togetherness." *Id*.

According to Bashy, their children adored Mosheh "as their father[,] and revered him as their teacher and rabbi," recognizing that they "were living with one of the great rabbinic figures of our generation." *Id*. ¶ 8. Yet despite his "greatness," Rabbi Twersky "was also a very sensitive and attentive husband," who "was intimately involved" with each family member and was never "too busy to spend time with them." *Id*. He took long walks with his children and "spoke with them about whatever they needed to speak about." *Id*. Bashy "can't bear the thought" that her husband "can no longer be there when [their children] need him in the years ahead." *Id*. ¶ 9.

Bashy recounts how Mosheh was at the Bnei Torah Synagogue on the morning of November 18, 2014, just a few buildings away from their family home, when she began to hear sirens while preparing to leave for work. *Id*. ¶ 10. Shocked and frightened, Bashy ran from the apartment toward the synagogue. *Id*. ¶ 11. The scene was "pandemonium," with "people shouting" and "ambulance sirens blaring." *Id*. Bashy stood "shaking and crying" behind the barricades, "begging the police for information." *Id*. When her children arrived at the scene, they had to prop up their mother to prevent her from collapsing. *Id*. ¶ 12. Bashy became increasingly hysterical as the family raced from one hospital to another seeking information about Mosheh. *Id*. Finally, Bashy received a call confirming her worst fears, experiencing "what it means for a heart to break." *Id*. ¶ 13.

Bashy was "in deep shock" during Mosheh's funeral, believing her life was "over." *Id*. ¶ 14. She soon realized that Mosheh's death was also "a loss for the community," as demonstrated by "hundreds of people [who] came forward to speak about the ways Mosheh had

impacted their lives." *Id.* ¶ 15.  Many of his students "described how he had influenced them as a teacher," while "complete strangers" from Israel and America recounted how Mosheh "had quietly assisted them in all kinds of ways." *Id.*

To this day, Bashy's grief "does not really feel any closer to ending than on the day of the attack." *Id.* ¶ 17.  Mosheh was her "best friend" and "soulmate," without whom her life was reduced to "going through the motions each day." *Id.*  Bashy "struggle[s] to get out of bed each morning and deal with the day's obligations." *Id.*  She feels Mosheh's absence most acutely during Jewish holidays. *Id.* ¶ 18.  She laments no longer being able to attend the Bnei Torah Synagogue due to the "agonizing" memories it evokes. *Id.*  Bashy cried throughout the first Rosh Hashanah service following Mosheh's death and was unable to participate in the preparation for the Passover meal that year, spending it "crying for more than two hours" while "sitting outside in her car." *Id.*  She recalls being "overwhelm[ed] at the prospect of arranging her son Avraham's marriage without her husband. *Id.*

### Meshulam Twersky—Rabbi Mosheh Twersky's Son

Meshulam Twersky supported his claim for compensatory damages through testimonial evidence captured in a declaration dated February 23, 2024 ("MT-Decl.") and a psychiatric evaluation prepared by Rael Strous, M.D., dated July 15, 2023 ("MT-Psych.-Eval.").

### Meshulam Twersky—Testimony

Meshulam Twersky was born in New York in 1982 and, at all relevant times, has been a U.S. citizen.  MT-Decl. ¶ 1.  He resides in Jerusalem, where he is a Talmudic scholar and teacher. *Id.* ¶¶ 2–3.

Meshulam describes his father as "an incredibly busy man with many responsibilities as a leader of [their] community," who nonetheless found time to spend with his son performing

charitable deeds—a tradition the two shared for ten years and one that drew them closer. *Id.* ¶ 4. When Meshulam was a teenager living in a school dormitory, Rabbi Twersky visited twice weekly for study sessions. *Id.* ¶ 5. Meshulam recalls sitting side by side with his father during synagogue services and walking home together, deeply immersed in conversations touching on "all sorts of subjects, especially how to put into practice the different ethical lessons [they] had studied together." *Id.* ¶ 6. To Meshulam, these experiences were "extremely important" and "central" to his life, as his father was not only his teacher, from whom he learned the meaning of "devotion to prayer," "personal discipline," and "spiritual priorities," but an affectionate parent who provided "personal guidance and advice" and who helped Meshulam, and his new bride purchase their first home. *Id.* ¶¶ 7, 9–10.

On the morning of November 18, Meshulam, who resided in a different neighborhood from his parents, had finished morning prayers at his synagogue when his brother-in-law told him of a terrorist attack in the Har Nof neighborhood. *Id.* ¶ 11. Meshulam immediately contacted his mother, who "confirmed [] the target" of the attack "was the synagogue where [his] father was praying." *Id.* Meshulam tried to convince himself that his father was safe and hiding in some part of the building unseen by the terrorists. *Id.*

Upon learning that his father had been killed, Meshulam's "shock and pain" were "indescribable." *Id.* ¶ 12. During the week-long mourning period, an emergency medical technician who responded to the attack revealed to Meshulam that Rabbi Twersky was stabbed and not shot. *Id.* ¶ 13. This detail, later confirmed by a witness to the attack, added to Meshulam's "great distress," who felt as if he were "experiencing the pain of the news of his death all over again." *Id.* ¶¶ 13–14.

Meshulam was "deeply affected" for the first year; he was "constantly emotional and on edge" and experienced an acute sense of grief, particularly on special occasions. *Id*. ¶ 15. He finds it "excruciatingly difficult" to visit his father's gravesite and "re-liv[e] the whole experience of his death and the funeral." *Id*. ¶ 16.

Meshulam found it very difficult to concentrate on his studies. *Id*. ¶ 17. And while he has somewhat "returned to a more normal schedule," he has "not completely recovered." *Id*. Since the death of his father, Meshulam's relationship with his children has also been strained as he "couldn't relax and interact with them normally." *Id*. ¶ 18. Meshulam still has nightmares of the attack "in which [he] see[s] terrorists running wild and lots of blood." *Id*. ¶ 25. He "thinks about [his] father" always and grieves for him every day. *Id*. ¶¶ 25–26.

### Meshulam Twersky—Psychiatric Evaluation

Dr. Rael Strous prepared a "Psychiatric Evaluation" of Meshulam Twersky after conducting a "clinical interview and formal psychiatric evaluation, as well as [a] review of the relevant materials in this case." MT-Psych.-Eval. at 1.

Dr. Strous reports Meshulam describing how his father's death resulted in his "low mood," "hypervigilance," nightmares, and depression. *Id*. at 3–5. Dr. Strous observed "signs and symptoms of dysthymia and chronic grief," which has had "significant family, social, professional, and emotional effects . . . in several areas of his life." *Id*. at 7.

Dr. Strous administered the Hamilton Depression rating scale, the Hamilton Anxiety rating scale, the Posttraumatic Diagnostic scale, the Interview Guide for Complicated Grief, and the Brief Grief Questionnaire, revealing "mild depression," the "presence of pathological/complicated grief," "mild anxiety," and "no PTSD [Post-Traumatic Stress Disorder]." *Id*. Based on his evaluation, Dr. Strous diagnosed Meshulam with "Prolonged grief

disorder  (moderate) (with traumatic bereavement)" and "Persistent Depressive Disorder, moderate severity, late onset, with pure dysthymic syndrome."  *Id*. at 8.

### Refael Twersky—Rabbi Mosheh Twersky's Son

Refael Twersky supports his claim for compensatory damages through testimonial evidence captured in a declaration dated January 10, 2022 ("RT-Decl.").

### Refael Twersky—Testimony

Refael Twersky was born in 1984, resides in New Jersey, and, at all relevant times, has been a U.S. citizen.  RT-Decl. ¶¶ 1, 2.

Refael describes Rabbi Twersky as an "ideal" father who was "attuned" to his children's needs and provided them with both "material and spiritual well-being."  *Id*. ¶ 3.  To Refael, his father "represented perfection," inspiring Refael with his "guidance and insight" while allowing him to make his own decisions. *Id*. ¶¶ 4–5.  In 2009, Refael married and relocated to the United States.  *Id*. ¶ 7.  Despite the geographic distance, he and his father maintained "a close relationship" and would speak often.  *Id*.  Refael recalls how his parents would visit him in New Jersey and how he would reciprocate by traveling to Israel.  *Id*.

Refael learned of the November 18 Attack through his sister.  *Id*. ¶ 8.  While it "was clear" that "something had happened to [their father]," his sister was initially unaware that their father had been killed.  *Id*.  When his father's death was confirmed, Refael booked a flight to Israel, arrived at his parents' apartment the following morning, and stayed for two weeks before returning to New Jersey.  *Id*. ¶¶ 8, 10, 15.  During that time, "[s]urvivors and other witnesses to the attack visited [] and shared their accounts of what had happened in the synagogue, and what the terrorists had done to [his] father."  *Id*. ¶ 13.  For Refael, listening to accounts of the brutal attack was "indescribably painful."  *Id*.

Following his father's death, Refael "could not imagine how [he] could go on with life." *Id.* ¶ 15. He had "difficulty" returning to his routine at home, finding it particularly "hard to concentrate." *Id.* Refael felt his father's absence most intensely during the Passover holidays. *Id.* ¶¶ 16, 17.

Refael's grief has not diminished "over the years"; on the contrary, he misses his father "more and more" as time passes. *Id.* ¶ 20. There have been "so many occasions" Refael would have loved to share with his father and benefit from his valued "advice and guidance." *Id.* He is particularly anguished when "hit by a memory or thought about [his] father and his absence." *Id.* ¶¶ 20–21.

### Rivka Walder—Rabbi Mosheh Twersky's Daughter

Rivka Wadler supports her claim for compensatory damages through testimonial evidence captured in a declaration dated February 21, 2024 ("RW-Decl.") and a psychiatric evaluation prepared by Rael Strous, M.D., dated July 21, 2023 ("RW-Psych.-Eval.").

### Rivka Walder—Testimony

Rivka was born in 1988 and, at all relevant times, has been a U.S. citizen. RW-Decl. ¶ 1. Rabbi Twersky was "very involved" in all aspects of Rivka's life, "even with minor things" like assisting her with homework. *Id.* ¶ 3. She "strongly" felt his presence at all times in her life. *Id.* ¶ 4. Rivka enjoyed taking late-night walks with her father through their neighborhood, where it was "so quiet" that one "could really think or talk without distraction." *Id.* ¶ 5. During the Sabbath, Rabbi Twersky would lead the family in song and conversations, "creat[ing] an environment of holiness that seemed to permeate the house." *Id.* ¶ 7.

On the morning of November 18, 2014, Rivka's mother telephoned to tell her of a shooting at Bnei Torah Synagogue *Id.* ¶ 9. Rivka and her husband drove across town to her

parents' apartment, listening for updates on the radio. *Id*. When they learned Rabbi Twersky was among those killed, Rivka's world "crumbl[ed]." *Id*.

Immediately following the funeral, Rivka began suffering from "frequent nightmares," would "wake up repeatedly throughout the night," and had "very little appetite"—problems that "continued for many months." *Id*. ¶ 14. She eventually regained her appetite but started suffering from "frequent migraine headaches." *Id*. Rivka "was constantly sad and often cried." *Id*. ¶ 15. Without her father, Rivka feels "lost." *Id*. ¶ 24.

### Rivka Walder—Psychiatric Evaluation

Dr. Rael Strous prepared a "Psychiatric Evaluation" of Rivka Walder after conducting a "clinical interview and formal psychiatric evaluation, as well as [a] review of the relevant materials in this case." RW-Psych.-Eval. at 1.

Dr. Strous reports Rivka describing how her father's death, in addition to evoking "profound feelings of ongoing loss and grief," caused her to experience "many anxiety and post-traumatic reactions" including nightmares, hypervigilance, avoidance of places that remind her of her father, physiological reactions such as "immediate tension" and "clear shaking" when queried about her father or the November 18 Attack. *Id*. at 4.

Dr. Strous observed Rivka exhibiting signs and symptoms of dysthymia, and chronic grief following the murder of her father, leaving her with "anxiety and low mood" lasting "several years to the present" and causing her to "experience[] significant family, social, and emotional effects [that] considerably affect[ed] her function in several areas of her life." *Id*. at 8.

Dr. Strous administered the Hamilton Depression rating scale, the Hamilton Anxiety rating scale, the Posttraumatic Diagnostic scale, the Interview Guide for Complicated Grief, and the Brief Grief Questionnaire, revealing "moderate depression," "mild anxiety," "minimal

PTSD," and the "presence of pathological/complicated grief." *Id*. at 7–8. Dr. Strous diagnosed Rivka with "Prolonged grief disorder, (moderate) (with traumatic bereavement)" and "Persistent Depressive Disorder, mild severity, late onset, with pure dysthymic syndrome." *Id*. at 8.

### Nechama Charlap—Rabbi Mosheh Twersky's Daughter

Nechama Charlap supports her claim for compensatory damages through testimonial evidence captured in a declaration dated February 21, 2024 ("NC-Decl.") and a psychiatric evaluation prepared by Rael Strous, M.D., dated July 20, 2023 ("NC-Psych.-Eval.").

### Nechama Charlap—Testimony

Nechama was born in 1989 and, at all relevant times, has been a U.S. citizen. NC-Decl. ¶ 1. When she was 19, Nechama was the only child living at home, which afforded her "a lot of quality time" with her father. *Id*. ¶ 3. Given their "similar personalities and intellectual natures," they developed a "very close bond." *Id*. ¶¶ 3–4. Nechama recounts how she and her father could "talk about anything" since he "was the person who really understood [her]," "who always knew how to help [her]," and who "was always there" to provide counsel. *Id*. ¶¶ 6, 10. To Nechama, her father was a man determined to "play an active role" in his children's lives and would put in that "extra effort, that personal touch" one "would not expect from a person of his stature." *Id*. ¶¶ 7–8.

When Nechama arrived at work on the morning of November 18, 2014, her colleagues told her of a terrorist attack that had taken place in her parents' neighborhood. *Id*. ¶¶ 14–15. She telephoned her mother, who was crying and frightened because her husband was not responding to her calls. *Id*. ¶ 15. Nechama contacted everyone she knew who either worked in a hospital or was attached to a rescue squad, with no success. *Id*. ¶ 16. She recalls neighbors transporting

members of her family from hospital to hospital, hoping to find Rabbi Twersky alive. *Id*. ¶ 17. When the family finally received news of his death, Nechama "froze[] in shock." *Id.* ¶ 18.

During "the first months after the attack," Nechama "cried every single day." *Id*. ¶ 23. For a "long time," she harbored "irrational fears and anxiety" and imagined what her reaction might be were she suddenly attacked. *Id*. ¶ 24. Nechama is constantly aware of her father's absence—a feeling she describes as "something [] burning inside." *Id*. ¶ 25. Her father's death "interferes with every aspect of [Nechama's] life. *Id*. ¶ 37.

### Nechama Charlap—Psychiatric Evaluation

Dr. Rael Strous prepared a "Psychiatric Evaluation" of Nechama Charlap after conducting a "clinical interview and formal psychiatric evaluation, as well as [a] review of the relevant materials in this case." NC-Psych.-Eval. at 1.

Dr. Strous reports Nechama describing how Rabbi Twersky's death resulted in her (1) "becoming anxious and always on edge," (2) constantly fearing "further terror attacks," (3) obsessing about possible escape routes in the event of an attack, (4) experiencing "significant anxiety" if her husband does not return home on time or if she misses a telephone call, and (5) having "flashbacks to the day of the terror attack" triggered when hearing of similar incidents. *Id*. at 3. Dr. Strous found Nechama exhibiting "signs and symptoms of anxiety, dysthymia," "chronic grief," and "anhedonia," with symptomatology that includes "anxiety," and "diminished ability to enjoy experiences and family celebrations." *Id*. at 7.

Dr. Strous administered the Hamilton Depression rating scale, the Hamilton Anxiety rating scale, the Posttraumatic Diagnostic scale, the Interview Guide for Complicated Grief, and the Brief Grief Questionnaire, revealing "moderate depression," "mild anxiety," the "presence of PTSD," and the "presence of pathological/complicated grief." *Id.* at 6. Dr. Strous diagnosed

Nechama with "Prolonged grief disorder, (moderate) (with traumatic bereavement)," "Anxiety Disorder, Unspecified," and "Persistent Depressive Disorder, mild severity, late onset, with pure dysthymic syndrome." *Id.* at 7.

### Avraham Twersky—Rabbi Mosheh Twersky's Son

Avraham Twersky supported his claim for compensatory damages through testimonial evidence captured in a declaration dated February 21, 2024 ("AT-Decl.") and a psychiatric evaluation prepared by Rael Strous, M.D., dated July 13, 2023. ("AT-Psych.-Eval.").

### Avraham Twersky—Testimony

Avraham Twersky, Rabbi Mosheh and Bashy Twersky's youngest child, was born in 1993 and, at all relevant times, has been a U.S. citizen. AT-Decl. ¶ 1. To Avraham, Rabbi Twersky was "larger than life." *Id*. ¶ 4. When Avraham began his Talmudic studies, his father, a "renowned rabbi and Talmudic scholar," "set aside an hour in the afternoons, three days each week, as well as on the Sabbath," for the two to study together—sessions Avraham describes as "the highlight" of his life. *Id*. ¶ 5.

Avraham attended middle and high schools outside Jerusalem. *Id*. ¶ 6. He recalls how his father would walk "twenty to thirty minutes regularly" from Har Nof to study with him—an "astonishing" gesture given Rabbi Twersky's "stature as a very prominent rabbinical leader" with an "extremely busy schedule." *Id*. To Avraham, it demonstrated how "important he was" to his father. *Id*.

To Avraham, his conversations with his father "about meaningful and spiritual matters" fostered a "mutual respect" that "strengthened [their] bond." *Id*. ¶ 8. And although his father "was not the kind of person who took vacations," Avraham recalls him disrupting his study

schedule to travel with Avraham to Northern Israel and Poland—experiences Avraham felt "privileged" to share.  *Id*. ¶ 10.

On November 18, 2014, Avraham was leading morning prayer services in a synagogue outside Har Nof when his cell phone began ringing.  *Id*. ¶ 15.  When the service ended, Avraham answered a call from his sister, who told him about the terrorist attack.  *Id*.  Avraham immediately went to the scene but could coax no information about his father from the attending emergency medical technicians or police officers.  *Id*. ¶ 16.  As he was preparing to visit area hospitals, Avraham learned from a news bulletin that there had been four unidentified fatalities.  *Id*.  When informed that his father was among them, Avraham became "too shocked to speak, to pray, even to cry" and remained "in a daze" for hours.  *Id*. ¶ 17.  Unlike his married siblings, who could turn to their spouses for comfort, Avraham was "still single," and without his father, he felt "completely alone in the world."  *Id*.

Seeking more information about the attack, Avraham questioned the police officers and witnesses.  *Id*. ¶ 19. One shocking detail that emerged was that the tefillin his father had been wearing at the time of his death was so saturated in blood it "had to be buried, in accordance with Jewish religious requirements concerning human remains."  *Id*.  After the week-long period of mourning, Avraham visited his father's grave, where he experienced what he believed to be a life-threatening anxiety attack.  *Id*.

Avraham misses his father "terribly" and "still live[s] with the pain and sorrow of [his] death and absence."  *Id*. ¶ 33.  For years, he was depressed and anxious about his family's safety.  *Id*. ¶¶ 35–36.  And whenever Avraham thinks of the November 18 Attack, he becomes "short of breath," experiences "heart palpitations," "starts to perspire," and has "nightmares and

flashbacks to the day of the attack." *Id*. ¶¶ 37–38.  Avraham feels the pain of his father's death today with the same intensity as on the day of the attack.  *Id*. ¶ 39.

### Avraham Twersky—Psychiatric Evaluation

Dr. Rael Strous prepared a "Psychiatric Evaluation" of Avraham Twersky after conducting a "clinical interview and formal psychiatric evaluation, as well as [a] review of the relevant materials in this case."  AT-Psych.-Eval. at 1.

Dr. Strous reports Avraham describing how his father's death led to (1) a loss of self-esteem, (2) anxiety and fears that terrorists move about freely, (3) hypervigilance in public places, (4) occasional nightmares, (5) extreme anxiety in the presence of Arabs, (6) guilt over not being at home on the night before the attack, (7) shortness of breath, heart palpitations, and sweating, when reminded of the November 18 incident, and (8) flashbacks to the day of the terror attack.  *Id*. at 4.  According to Dr. Strous, Avraham exhibited "signs and symptoms of dysthymia, anxiety, and chronic grief." *Id*. at 4, 7.

As part of his evaluation, Dr. Strous administered the Hamilton Depression rating scale, the Hamilton Anxiety rating scale, the Posttraumatic Diagnostic scale, the Interview Guide for Complicated Grief, and the Brief Grief Questionnaire, revealing "mild depression," "mild anxiety," "mild PTSD" and "pathological/complicated grief."  *Id*. at 6–7.  Dr. Strous diagnosed Avraham with "Prolonged grief disorder,  (moderate) (with traumatic bereavement)" and "Persistent Depressive Disorder; moderate severity, late onset, with pure dysthymic syndrome." *Id*. at 8.

### ANALYSIS

The Twersky Plaintiffs seek compensatory relief under 28 U.S.C. § 1605A(c) for pain and suffering, loss of solatium, and economic damages.  Upon review of the evidence, in light of

the legal framework set out below, the Special Master considers the viability of their claims and the proper measure of any damages award. (Where relevant, the Special Master has also considered plaintiffs' arguments set out in an undated damages memorandum ("Twersky Damages Memo")).

**STANDARD OF PROOF**

To recover under the FSIA, a "default winner must prove damages 'in the same manner and to the same extent as any other default winner.'" *Estate of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 242–43 (D.D.C. 2012) (quoting *Wachsman ex rel. Wachsman v. Islamic Republic of Iran*, 603 F. Supp. 2d 148, 160 (D.D.C. 2009)). In the context of a default judgment, courts in this jurisdiction carve a "'clear distinction' in the standard of proof necessary to establish a plaintiff's *entitlement* to damages and to assess the *amount* of those damages." *Rhodes v. United States*, 967 F. Supp. 2d 246, 313 (D.D.C. 2013) (emphases in original) (*quoting Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562 (1931)). For future damages, a plaintiff must demonstrate entitlement to a "reasonable certainty" or by a preponderance of the evidence and must prove damages by a "reasonable estimate." *Hill v. Republic of Iraq,* 328 F.3d 680, 684 (D.C. Cir. 2003). For past losses, a plaintiff must "prove the *fact* of injury with reasonable certainty," *Samaritan Inns, Inc. v. District of Columbia*, 114 F.3d 1227, 1235 (D.C. Cir. 1997) (emphasis added), yet need only "reasonably prove" the amount of damages. *Hill*, 328 F.3d at 684.

The quantum of proof necessary to trigger an award of damages "may be established by affidavit or declaration which, upon evaluation, the Special Master 'may accept plaintiffs' uncontroverted evidence as true.'" *Maupin v. Syrian Arab Republic*, 405 F. Supp. 3d 75, 85 (D.D.C. 2019) (quoting *Lanny J. Davis & Associates LLC v. Republic of Equatorial Guinea*,

962 F. Supp. 2d 152, 161 (D.D.C. 2013)). *See Int'l Rd. Fed'n v. Embassy of the Democratic Republic of the Congo*, 131 F. Supp. 2d 248, 250 (D.D.C. 2001) (permitting plaintiffs to "prove both liability and damages... based on submission of affidavits, without the need for live testimony at a hearing") (citation omitted); *Kim v. Democratic People's Republic of Korea*, 87 F. Supp. 3d 286, 289 n.1 (D.D.C. 2015) (allowing plaintiffs to "establish the necessary proof for damages through affidavits or live testimony") (citation and internal quotation marks omitted).

## PAIN AND SUFFERING
### (The Estate of Rabbi Mosheh Twersky)

Rabbi Twersky's estate provided evidence that he did not immediately succumb to the wounds he sustained in the November 18 Attack.  Yosef Posternac witnessed an attacker first shoot Rabbi Goldberg, who was praying right next to Rabbi Twersky, and,"[w]ithin a few seconds," shoot Rabbi Twersky who lay writhing in his own blood until "the second terrorist pounced on him with the butcher's knife, and made sure [he] was dead."  YP-Decl. ¶¶ 8–9.

For periods of pain and suffering of less than a minute to a few hours after an attack but before death, our courts have found damages of $1 million an appropriate award.  *Braun v. Islamic Republic of Iran*  228 F. Supp. 3d 64, 83 (D.D.C. 2017).  *See Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1, *5 (D.D.C. 2000) (awarding compensatory damages of $1,000,000 each for "several minutes" of pain and suffering of two decedents who died at the scene of the same bombing); *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 113 (D.D.C. 2000) (awarding $1 million for three or four minutes of pain and suffering).

The Special Master will not deviate from this precedent and recommends the Estate of Rabbi Mosheh Twersky receive $1 million in damages for pain and suffering.

## ECONOMIC DAMAGES
### (Rabbi Mosheh Twersky)

Rabbi Twersky's estate seeks financial damages arising out of the November 18 Attack. Before analyzing the particulars of his claim, several overarching principles guiding the Special Master's disposition should be noted.

28 U.S.C. § 1605A, like its statutory predecessor, 28 U.S.C. § 1605(a)(7), establishes a cause of action for economic damages resulting from state-sponsored terrorism. To establish a right to such a recovery, plaintiffs must present "evidence which affords a reasonable basis for measuring the claimant's loss." *Bova v. Islamic Republic of Iran*, No. 15-CV-1074 (RCL), 2020 WL 2838582, at *11 (D.D.C. May 31, 2020).

While neither lost earnings (i.e., a loss of monetary income such as wages or earnings) nor lost earnings capacity (i.e., a decrease in the ability to earn income such as loss of future earnings, diminution of ability to earn, or impairment of earning power) "can []ever be predicted with complete confidence," *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 546 (1983), and "mathematical exactitude is often impossible," *Stearns v. Islamic Republic of Iran*, No. 17-CV-131 (RCL), 2023 WL 4999967, at *4 (D.D.C. Aug. 4, 2023) (quoting *Bova*, 2020 WL 2838582, at *11), monetary damages "may be proven by the submission of a forensic economist's expert report," *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 402 (D.D.C. 2015) (citing *Belkin v. Islamic Republic of Iran,* 667 F. Supp. 2d 8,  24 (D.D.C. 2009)), provided the expert's underlying calculations comport with Federal Rule of Evidence 702 and are grounded in well-supported assumptions. In other words, although "absolute certainty is not required," *Kieffer v. Weston Land, Inc.*, 90 F.3d 1496, 1499 (10th Cir. 1996) (internal quotation marks and citation omitted), forensic expert testimony must be excluded if based on "unrealistic assumptions regarding the plaintiff's future employment prospects," *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996), or is bottomed on "facts that [are] clearly

Page 22 of 31

contradicted by the evidence," *Boyar v. Korean Air Lines Co.*, 954 F. Supp. 4, 8–9 (D.D.C. 1996), as such testimony "has no significant probative value." *Villalobos v. American Airlines, Inc.*, No. 96-6413-CIV, 1998 WL 1770592, at *6 (S.D. Fla. Nov. 13, 1998).

To guard against such "unsupported speculation," the Special Master is charged with examining "the reasonableness and foundation of the assumptions relied upon by the expert," *Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 164–165 (D.D.C. 2017) (quoting *Roth*, 78 F. Supp. 3d at 402), before recommending the adoption of a forensic analysis—a scrutiny enhanced in the face of projected losses "[d]epart[ing] from actual pre-injury earnings." *Estate of Henkin v. Islamic Republic of Iran*, No. 1:18-CV-1273 (RCL), 2023 WL 3319425, at *3 (D.D.C. May 09, 2023) (quoting *Andler v. Clear Channel Broad., Inc.*, 670 F.3d 717, 727 (6th Cir. 2012)).

The Estate has presented evidence of financial loss through personal testimony bolstered by a forensic economic report prepared by Eco-Stat, whose expertise in forensic economics is a matter of record regarding FSIA damages calculations. *See, e.g.*, *Ben-Yishai v. Syrian Arab Republic*, 642 F. Supp. 3d 110, 120 (D.D.C. 2022) (recognizing Mr. Soudry "as an expert in forensic accounting") and *Force v. Islamic Republic of Iran*, 617 F. Supp. 3d 20, 31 (D.D.C. 2022) (recognizing Mr. Soudry as "an expert for the purpose of determining economic loss").

Mr. Soudry projected Rabbi Twersky's economic losses after reviewing his estate's submissions and overlaying information from those sources onto generally accepted statistical data to project Rabbi Twersky's life and worklife expectancies. He then factored in future growth, tax liability, personal consumption, and projected economic losses, and discounted Rabbi Twersky's estimated losses to present value utilizing 10-year Long-Term Government Bonds.

The Special Master finds the methodology employed by Mr. Soudry to be appropriate, given his review of relevant source material, his reliance on well-established statistical information to estimate work life expectancies, taxes, future growth, and his conservative use of long-term bond rates to adjust lost income to present value. *See Baker v. Socialist People's Libyan Arab Jamahir*iya, 775 F. Supp. 2d 48, 80 (D.D.C. 2011) (accepting "discounted future earnings to present value with the average yield on high-grade municipal bonds").

The only variable presented is Rabbi Twersky's worklife expectancy, for which Mr. Soudry offers two possible retirement ages: 67.0 and 75.0. That choice is narrowed somewhat, given the testimony of Rabbi Moshe Meiselman, Dean and founder of the religious institution where Rabbi Twersky was employed. According to Rabbi Meiselman, yeshiva teachers "consider their teaching of Jewish religious texts and Jewish law to be a life-long religious pursuit and duty, and therefore do not retire," but "continue teaching until the end of their lives." MM-Decl. ¶ 6. The Special Master accepts this testimony and assumes that, but for the November 18 Attack, Rabbi Mosheh Twersky would not have retired before turning 75 and, therefore, recommends his estate receive $121,583 in economic damages.

### SOLATIUM DAMAGES
(Bashy Miriam Twersky, Meshulam Twersky, Refael Twersky, Nechama Charlap,
Rivka Walder and Avraham Twersky)

Bashy Miriam Twersky, Meshulam Twersky, Refael Twersky, Nechama Charlap, Rivka Walder, and Avraham Twersky seek damages for loss of solatium arising from the death of their husband and father, Rabbi Mosheh Twersky. Before analyzing their claims, a brief recitation of the law governing solatium damages is in order.

Terrorist acts, "by their very definition," are "extreme and outrageous and intended to cause the highest degree of emotional distress." *Belkin,* 667 F. Supp. 2d at 22 (citing *Stethem v.*

*Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002)).  The FSIA provides for the award of solatium damages to compensate for the "'[m]ental anguish, bereavement and grief' resulting from a loved one's death or injury."  *Schertzman Cohen v. Islamic Republic of Iran*, No. CV 17-1214 (JEB), 2019 WL 3037868, at *7 (D.D.C. July 11, 2019) (quoting *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 356–57 (D.C. Cir. 2018)).

When awarding solatium damages, our courts recognize that family members in direct lineal relationship to the victims injured in a terrorist attack are "presume[d] . . . [to] suffer compensable mental anguish . . . and testimony proving a close emotional relationship will usually be sufficient to sustain an award of solatium damages."  *Kim*, 87 F. Supp. 3d at 290 (quoting *Roth*, 78 F. Supp. 3d at 402).   To maintain uniformity, courts look for guidance in "prior decisions," *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 29 (D.D.C. 2008), and typically defer to the framework established in *Heiser v. Islamic Republic of Iran* (*Heiser I*), 466 F. Supp. 2d 229, 269 (D.D.C. 2006), awarding $8 million for pain and suffering resulting from the death of a spouse, $5 million to a parent whose child was killed, and $2.5 million to a plaintiff whose sibling was killed.

There are, however, different perspectives on what constitutes a proper solatium award for children of victims.   One line of cases holds that the children of a deceased victim should be awarded $3 million.  *See Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 39 (D.D.C. 2012) ("Children of a deceased victim typically receive an award of $3 million, while children of a surviving victim receive $1.5 million"); *O'Brien v. Islamic Republic of Iran*, 853 F. Supp. 2d 44, 46–47 (D.D.C. 2012) (same).    Other courts consider solatium awards of $5 million more appropriate.  *See Selig v. Islamic Republic of Iran*, 573 F. Supp. 3d 40, 65 (D.D.C. 2021) ("Under the *Heiser* framework . . . a child receives $5 million . . ."); *Opati v. Republic of Sudan*,

60 F. Supp. 3d 68, 79 (D.D.C. 2014) ("[C]hildren of deceased victims will be awarded $5 million").

The Special Master finds the rationale offered by the latter line of cases better reasoned for their adherence to the guidelines in *Peterson v. Islamic Republic of Iran (Peterson II)*, 515 F. Supp. 2d 25, 51 (D.D.C. 2007), whereby family members of deceased victims are awarded twice the amount given to relatives of injured victims. *Opati*, F. Supp. 3d at 79. As the recommended award for a child of an injured victim is $2.5 million, *Peterson II*, 515 F. Supp. 2d at 51, the Special Master will apply this doubling formula and calculate the pre-enhancement baseline award for the Twersky children at $5 million.

These numbers, however, are neither immutable nor "set in stone," *Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 35 (D.D.C. 2016) (quoting *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 74 (D.D.C. 2010)), and therefore subject to deviation where circumstances dictate, at "the discretion of the particular court in each case." *Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1, 43 (D.D.C. 2018) (quoting *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 26 (D.D.C. 2011)). *See Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 59–60 (D.D.C. 2018) ("These amounts, however, are merely guideposts, and courts *should* deviate depending on the circumstances.") (emphasis added) (citing *Fraenkel*, 892 F.3d at 361–62).

Acknowledging that "different plaintiffs (even under FSIA) will prove different facts that may well (and should) result in different damage awards," *id*. at 362 (internal quotation marks and citation omitted), courts have enhanced awards for loss of solatium (1) in the face of "aggravating circumstances that appreciably worsen the surviving spouse's pain and suffering, such as cases involving torture or kidnapping of a spouse," *Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90, 108 (D.D.C. 2006); (2) where the "evidence establish[es] an especially

close relationship," *Spencer v. Islamic Republic of Iran*, 71 F. Supp. 3d 23, 28 (D.D.C. 2014), when compared to "the normal interactions to be expected given the familial relationship," *Oveissi,* 768 F. Supp. 2d at 26–27; or (3) in the presence of "medical proof of severe pain, grief or suffering on behalf of the claimant." *Roth*, 78 F. Supp. 3d at 403.  This list is not exhaustive.

Finally, "any departures from the *Heiser* framework are generally small relative to the award specified by the developed framework," *id*., and when courts depart upward, "they usually do so because of an unusual circumstance beyond the ordinary anguish that results from losing a family member." *Selig*, 573 F. Supp. 3d at 66.  *See*, *e.g.*, *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 51 (D.D.C. Mar. 1, 2016) (awarding 25% upward departure to mother present at the terrorist attack who witnessed her daughter "carried out of the ballroom into an ambulance"); *Baker*, 775 F. Supp. 2d at 83 (enhancing award by 25% enhancement to plaintiff who had "turned to self-destructive behavior to cope with his pain over his sister's death"); *Cabrera v. Islamic Republic of Iran*, No. CV 18-2065 (JDB), 2022 WL 2817730, *50 (D.D.C. July 19, 2022) (finding an upward deviation of 20% appropriate for claimants who manifested "suicidal thoughts and attempts").

Absent these extraordinary circumstances, courts generally adhere to the *Heiser* structure. *See*, *e.g.*, *Roth*, 78 F. Supp. 3d at 405 (denying an enhancement because the evidence did not "demonstrate an unusual degree of mental anguish that would warrant an increased or decreased damages award").

Bashy Miriam Twersky, Meshulam Twersky, Refael Twersky, Nechama Charlap, Rivka Walder, and Avraham Twersky have presented colorable claims to recover compensatory damages for the emotional anguish each suffered as a direct result of the murder of Rabbi

Mosheh Twersky.  Their suffering is presumed under applicable precedents and amply supported by the supplied declarations.

Bashy describes her husband as her "best friend" and "soulmate," whose absence has "overwhelmed" her and rendered her unable to enjoy holidays or celebrate family events. Meshulam was "deeply affected" by his father's death, becoming "constantly emotional and on edge" and unable to concentrate on his studies.  Refael could not imagine life without his father, finding it difficult to continue his daily routine and to concentrate.  After her father died, Rivka began suffering from "frequent nightmares," would "wake up repeatedly throughout the night," had "very little appetite," and started suffering from "migraine headaches."  Nechama "cried every single day," is constantly aware of her father's absence, and suffers from "irrational fears." Avraham misses his father "terribly," suffers from depression and anxiety and occasionally experiences shortness of breath, heart palpitations, and flashbacks to the day of the attack.

In sum, each member of the Twersky family has presented highly credible testimony that compellingly evidences the close relationship they enjoyed with Rabbi Twersky before the terrorist attack and their anguish at losing "the mutual benefit that each family member receives . . . including love, affection, care, attention," *Wilson v. City of Chicago*, 758 F.3d 875, 883 (7th Cir. 2014), because of his murder.

Plaintiffs also request awards enhanced beyond the monetary caps suggested by *Heiser*. Bashy Twersky seeks $10 million in solatium damages, while her children each ask for $6 million.  Twersky Damages Memo at 11, 19.  They claim an increased award is merited, given (1) evidence establishing the "especially close relationship" each enjoyed with Rabbi Twersky and (2) the circumstances surrounding the attack that rendered their suffering more acute due to the proximity to their home.  *Id*. at 10, 19.

The Special Master finds both arguments meritless.

Evidence Establishing an Especially Close Relationship

The Special Master does not question that members of the Twersky family were devoted to Rabbi Twersky and shared a deep spiritual bond.  To Bashy, Mosheh was the "center" of their family's life, BT-Decl. ¶ 7, to Avraham, he was a "larger than life" figure, AT-Decl. ¶ 4, to Meshulam, he was an "extremely important" presence, central" to his life, MT-Decl. ¶ 6, to Refael, he was a source of inspiration, "guidance, and insight," RT-Decl. ¶ 5, to Nechama, he was a person with whom she had a "very close bond," NC-Decl. ¶ 4, and to Rivka, he was a presence "strongly" felt throughout her life.  RW-Decl. ¶ 4.

These connections, however close, fall short of the proof courts require before considering a deviation from *Heiser*.  In *Kinyua v. Republic of Sudan*, 466 F. Supp. 3d 1, 11 (D.D.C. 2020), for example, the court found that a brother who "lost his job of 24 years" as well as his benefits, was separated from his wife and eventually divorced, and "suffered from heavy alcohol consumption, sleeplessness, and lonesomeness" to care for his brother, emblematic of an "especially close relationship."  In *Relvas v. Islamic Republic of Iran*, No. 1:14-CV-01752-RCL, 2018 WL 1092445, *4 (D.D.C. Feb. 28, 2018), the court held that, where one brother was "a surrogate father for [the other] during their parents' prolonged absences," and the two "were placed in the foster system together, worked for the same employer, engaged in activities together, did homework together and generally enjoyed a relationship more intimate than that shared by most siblings" an example of "an especially close relationship."

Mindful that "courts generally calculate solatium damages by looking to prior decisions for guidance," *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 72 (D.D.C. 2015), the Special Master finds the relationship between Rabbi Twersky and members of his family, while

Page 29 of 31

close, does not "appear[] to transcend the normal bond[s] between [family members]." *Alinejad v. Islamic Republic of Iran*, 19-CV-3599 (GMH), 2023 WL 4684929, at *23 (D.D.C. July 6, 2023).

Aggravating Circumstances

As tragic as the November 18 Attack was, the record reveals no "aggravating circumstances" warranting an adjustment to *Heiser*.  While undeniably brutal, the November 18 Attack did not involve torture or kidnapping—circumstances our courts have traditionally found to aggravate the pain and suffering of family members appreciably.  *Greenbaum*, 451 F. Supp. 2d at 108.  *See, e.g., Warmbier v. Democratic People's Republic of Korea*, 356 F. Supp. 3d 30, 59 (D.D.C. 2018) (awarding $15 million to parents, who, while son was abducted were "permitted almost no facts regarding his condition to be known," causing them constant worry and uncertainty over what was happening to him); *Sotloff v. Syrian Arab Republic*, No. 16-CV-725 (TJK), 2022 WL 22902285, at *22 (D.D.C. May 20, 2022), *report and recommendation adopted*, No. 16-CV-725 (TJK), 2023 WL 2727599, at *1 (D.D.C. Mar. 31, 2023) (awarding solatium enhancements to parents and siblings of terror victim whom they did not know if he was alive or dead, whose attempts to secure his release ultimately failed and whose brutal death was captured on video).

The Special Master declines to modify the traditional solatium formula, finding that the *Heiser* baseline accounts for these "type[s] of suffering and is designed to compensate [family members] for it."  *Abedinigalangashy v. Gov't of the Islamic Republic of Iran*, No. CV 23-1105 (JEB), 2024 WL 4227133, at *9 (D.D.C. Sept. 18, 2024) (citation omitted).

Finally, the Special Master finds plaintiffs' contention that their "proximity" to the Bnei Torah Synagogue during the November 18 Attack somehow entitles them to enhanced damages finds no support in law or fact and cannot be considered.

The Special Master therefore recommends Bashy Miriam Twersky receive $8 million and Meshulam Twersky, Refael Twersky, Nechama Charlap, Rivka Walder, and Avraham Twersky each receive $5 million in damages for loss of solatium.

## CONCLUSION

For the reasons articulated above, the Special Master recommends the Estate of Rabbi Mosheh Twersky receive One Million Dollars ($1,000,000) in damages for pain and suffering and One Hundred Twenty-One Thousand Five Hundred Eighty-Three Dollars ($121,583) in damages for economic loss.

The Special Master further recommends Bashy Miriam Twersky receive Eight Million Dollars ($8,00,000) and Meshulam Twersky, Refael Twersky, Nechama Charlap, Rivka Walder, and Avraham Twersky each receive Five Million Dollars ($5,000,000) in solatium damages.

Dated:  May 11, 2025                                      /s/Alan L. Balaran
                                                         Alan L. Balaran, Esq.
                                                         Special Master